UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **CHAPTER 11** |
| **JOHN L. UNDERWOOD** | ) | |
| **COMPANY, INC.** *et al.* | ) | **CASE NO. \_\_\_\_** |
| | ) | |
| Debtors. | ) | **(Joint Administration Proposed)** |

### DECLARATION OF DOUGLAS M. UNDERWOOD
### IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, DOUGLAS M. UNDERWOOD, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the President, Chief Executive Officer, majority stockowner, and director of each of the following companies that are serving as debtors in the above-referenced cases (collectively the "***Debtors***"): John L. Underwood Company, Inc. ("Underwood"); Underwood Air Systems, Inc. ("Underwood Air"); Underwood HVAC, Inc. ("Underwood HVAC"); Underwood Administrative Services, Inc. ("Underwood Administrative"); and Lockwood Products, Inc. ("Lockwood").

2. Each of the Debtors are corporations organized under the laws of the State of Georgia, and their principal place of business is located at 4450 Commerce Drive, SW, Atlanta, Georgia 30336.

3. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtors to commence their Chapter 11 cases and in support of (i) the Debtors' petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) the relief requested by the Debtors pursuant to various motions filed contemporaneously herewith (collectively, the "***First Day Motions***").

362464 v5

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration on their behalf

5. Further, I have reviewed each of the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

## BACKGROUND

### Corporate Structure

6. The Debtors' business was founded in 1938 by my grandfather, John L. Underwood, Jr.  The Debtors are privately held companies and their stock is not publicly traded.

7. Underwood is the parent company and owns 100% of the stock of each of the other four subsidiary companies: Underwood Air; Underwood HVAC; Underwood Administrative; and Lockwood.

8. I am the majority shareholder of Underwood.  The minority shareholders of Underwood include four family relatives and certain officers of the company.

9. The principal officers of Underwood and the subsidiaries are: Douglas M. Underwood (President and CEO);  James E. Gibson (Vice President and Chief Operating Officer);  Glenn Bache (Chief Financial Officer); and  Daniel L. Underwood (Secretary).

### Business Operations

10. The Debtors are generally engaged in the sale, design, manufacture, marketing, distribution and supply of various heating and air-conditioning equipment and parts.

362464 v5

Underwood is primarily a holding company that does not engage in significant business operations, which are conducted through the four subsidiary companies as summarized below:

- **Underwood Air Systems, Inc**. is engaged in the design, manufacture, distribution, value added fabrication, marketing and sales of equipment and systems to heat, cool, clean, move and distribute air for ventilation and material handling applications in industrial and commercial environments.

- **Lockwood Products, Inc**. designs, manufactures, markets and sells deaeration, boiler feed, condensate return, vacuum and heat recovery systems, cooling towers, circulating pumps, centrifugal and turbine pumps and miscellaneous auxiliary steam boiler system equipment. These systems are used primarily for low and medium pressure steam boilers used for heating or process applications, industrially, commercially and institutionally.

- **Underwood HVAC, Inc.** is engaged in the supply, delivery, and installation of heating and air-conditioning equipment and parts, and maintains in its inventory a wide variety of motors, blowers and blades, controls, compressors, tools and miscellaneous parts.

- **Underwood Administrative Services, Inc**. provides all the financial, accounting and employee benefits administration to the Underwood companies. Additionally, warehouse and manufacturing services are managed within Administrative Services.

11. To run their businesses, the Debtors employ approximately forty (41) employees.

12. The Debtors' headquarters and primary office location is at 4450 Commerce Drive, SW, Atlanta Georgia 30336. The Debtors' also have an office location in Nashville Tennessee, but the Debtors' intend to save costs by closing down that location. The Debtors lease their current locations and do not own any real estate.

**Debt Structure**.

13. The Debtors are party to a certain loan agreement and security agreement (the "***Loan Agreement***") with FCC, LLC d/b/a First Capital ("***FCC***"), pursuant to which FCC provides a revolving line of credit (the "***Line of Credit***") to fund the Debtors' operations and general working capital needs.

3

14. The amount of borrowing available under the Line of Credit (the "Borrowing Base") equals the lesser of (i) a maximum loan amount of $3,000,000 or (ii) the sum of (a) eighty-five percent (85%) of eligible accounts receivable plus (b) fifty percent (50%) of the dollar value of eligible inventory not to exceed fifty percent (50%) of the maximum loan amount, and subtracting from that the sum of such reserves as FCC may reasonably establish in its discretion. The non-default interest rate under the Line of Credit is equal to the sum of LIBOR plus 8.50%.

15. The current outstanding net principal balance owed by the Debtors under the Line of Credit is approximately $1.98 million (the "***FCC Debt***").

16. In the ordinary course of Debtors' business it is often necessary and appropriate to order, purchase and take delivery of supplies, inventory and other goods on credit from various suppliers and vendors. Suppliers and vendors who do not receive payment are in some instances not willing to continue doing business with the Debtors and in other instances insist on being paid in cash upon delivery of the supplies or inventory. The Debtors currently owe approximately $1.5 million in outstanding debt to its trade suppliers and vendors (the "***Trade Debt***").

17. The Debtors' principal assets consist of (i) account receivables totaling approximately $1.52 million, (ii) inventory valued on a cost basis at approximately $1.76 million and (iii) cash proceeds from the sale and leaseback of the Debtors' principal office of approximately $620,000, which is being held in escrow by FCC as additional collateral for the FCC Debt.

362464 v5

18. FCC asserts a lien on substantially all of the Debtors' assets. With total assets of approximately $3.9 million or higher serving as collateral for the approximate $2.0 million in FCC Debt, FCC is fully secured.

19. Pursuant to the Loan Agreement, all income received from the Debtors' customers in payment of the Debtors' accounts receivable are paid into a lockbox controlled by FCC (the "Lockbox"), and all of such monies are applied by FCC toward the outstanding FCC Debt owed under the Line of Credit.

**Events Leading To Chapter 11 Filing**

20. The Debtors' operations are concentrated in the design, manufacturing, marketing, sales and installation of commercial, industrial and institutional HVAC, air moving and ventilation systems. Demand for the Debtors' business is dependent, in part, on the level of new construction of commercial, industrial and institutional buildings or renovation of existing buildings.

21. Due to the substantial economic downturn and general slowing of the construction industry in past years, the Debtors' income and financial condition has deteriorated.

22. Although the Debtors have remained current on the FCC Debt and have not made any payment defaults, the decline in revenue in 2010-2011 led FCC to assert that the Debtors failed to satisfy certain "financial covenants" in the Loan Agreement pertaining to the Debtors' overall earnings and net worth, thus placing the Debtors in possible default under the Loan Agreement. As a result, FCC lowered the amount of available credit under the Line of Credit based on the level of eligible account receivables in the Borrowing Base calculation, resulting in Debtors having less money available to pay the outstanding Trade Debt after meeting current

5

operating obligations. As a consequence, much of the monthly net profits have gone to pay down the FCC Debt instead of the Trade Debt or other working capital needs of the Debtors

23.  To address such cash flow and to avoid FCC from exercising its possible default remedies under the Loan Agreement, in or around June of 2011 Debtors entered into a "sale-leaseback" transaction whereby the Debtors sold their principal office building in Fulton County, Georgia to a real estate holdings company for approximately $1.5 million, and then leased the premises back under a twelve year lease. The primary goal of the sale-leaseback transaction was to generate cash proceeds from the sale to bring much of the Trade Debt current. In discussions leading up to the sale-leaseback, the Debtors understood FCC would allow most all of the sale proceeds to go to the Debtors' operations, save a hold back of $250,000, which induced the Debtors to go forward with the negotiations of the transaction. However, as the parties got closer in time to closing the transaction, FCC began increasing its hold back demands, such that by the eve of closing the sale, FCC would not consent to the sale or to release its lien from the real estate unless approximately $825,000 of the sales proceeds was held in escrow by FCC as additional collateral for the FCC Debt (the "*Cash Escrow*"). Because the Debtors were not able to utilize all of the sales proceeds, they were not able to bring all of the Trade Debt current.

24.  To address their operational cash flow needs and the outstanding Trade Debt, the Debtors requested FCC to release to the Debtors more of the sales proceeds being held by FCC in the Cash Escrow. At or around the time of the sale-leaseback, the Debtors understood from their discussions with FCC that approximately $450,000 of the Cash Escrow would be released in short order to the Debtors. Although the Debtors' complied with FCC's information requests and requirements need to release funds from the Cash Escrow, FCC continually delayed and failed to release any of the expected funds from the Cash Escrow.

362464 v5

25. As a result of FCC's actions, the Debtors were unable the past several months to devote any significant sales proceeds or monthly Net Profits they otherwise hoped to apply toward payment of the Trade Debt. In turn, the Debtors' suppliers and vendors have become reluctant to continue doing business with Debtors or have insisted on being paid in a cash-on-delivery basis. This in turn has impacted Debtors' ability to continue normal operations and continue generating positive revenue.

26. Belatedly, in late September 2011, FCC did release a small amount of the Cash Escrow (approximately $130,000) to the Debtors, but such amount has proved insufficient to dramatically rectify the over cash squeeze facing the Debtors on a frequent basis from their Trade Debt; nor has it cured the financial covenants which FCC contends are in default.

27. Consequently, after taking stock of their financial picture, the Debtors' decided it was in the best interest of the Debtors, their business operations, and their employees and creditors to seek the protection of Chapter 11 in order (i) to stabilize and enhance its business operations through the use of positive cash flow generated on a monthly basis, (ii) to provide for an expeditious restructuring of its senior secured debt, and (iii) to retain and preserve relationships with suppliers and customers.

28. Accordingly, on October 4, 2011 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### **FIRST DAY MOTIONS**

29. Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed their First Day Motions described herein. I have reviewed the First Day Motions and believe that the facts set forth therein are true and correct to the best of my knowledge.

362464 v5

30. As described below, I believe the relief requested in the First Day Motions will minimize the adverse effects of the Chapter 11 case on the Debtors and help ensure their reorganization efforts proceed as efficiently as possible.

### A. Employee Wages Motion

31. In the ordinary course of their businesses, the Debtors incur payroll obligations to their employees (the "*Employees*"). Of the Debtors' forty-one (41) Employees, twelve (12) are paid hourly, twelve (12) are salaried and seventeen (17) are paid through commissions or some combination of salary and commissions. The Employees perform critical functions for Debtors including design, manufacturing, fabrication, marketing, sales and delivery of Debtors' products as well as providing management, customer service, finance, accounting, human resources and employee benefits services to Debtors.

32. Through the *Debtors' Motion for An Order Authorizing Payment of (A) Prepetition Employee Wages, Salaries and Related Items; (B) Prepetition Contributions Under Employee Benefits Plans; and (C) Prepetition Employee Payroll Deductions* (the "**Wages Motion**") the Debtors seek authority to certain pre-petition obligations owing to the Employees and described as follows which may have accrued prior to the Petition Date but have not yet been paid:

  (a) wages, salaries, commissions, holiday pay and other similar forms of earned compensation, together with reimbursement of employee business expenses (the "Prepetition Compensation") which the Debtors estimate to total approximately $29,850.00 as of the Petition Date;

  (b) deductions collected by Debtors from Employees' paychecks but not yet paid by the Debtors for the purposes of (i) employee contributions towards 401(k) savings programs, (ii) insurance premiums relating to certain health benefit plans and (iii) certain garnishments, child support or other employee wage deduction orders (collectively, the "Prepetition Deductions") which the Debtors estimate to total approximately $8,000.00 as of the Petition Date;

8

(c) monetary obligations owed by the Debtors with respect to certain employee benefit programs, including health, dental, life and disability insurance and other similar programs (collectively, the "Prepetition Benefits") which the Debtors estimate to total approximately $13,000 as of the Petition Date;

33. The Debtors' records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular Employee will not exceed the sum of $11,725 allowable as a priority claim under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

34. Accordingly, the Court should authorize the payments described in the Wages Motion. Granting such relief will help ensure the uninterrupted delivery of the Employees' services to the Debtors as well as help create normality and aid in the Debtors maintaining a "business as usual" atmosphere. Otherwise, the Debtors face the risk that their operations and customers relations may be jeopardized through reduced employee morale and possible attrition if authority is not granted to make the payments described in the Wages Motion.

B. **Cash Collateral Motion**

35. Through the *Debtors' Emergency Motion for an Order Authorizing the Use of Cash Collateral* (the "**Cash Collateral Motion**") the Debtors seek Court approval to use cash in which FCC asserts a lien (the "cash collateral"). Such cash collateral consists primarily of a small amount of cash on hand plus the normal revenue and income received from the Debtors' customers through the collection of the Debtors' accounts receivable.

36. The Debtors have an immediate need for the use of cash collateral and will suffer irreparable harm if they are not allowed urgently to use cash collateral for, among other things, continuing their regular business operations in an orderly manner; maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees,

9

and satisfying other working capital and operational needs--all of which are vital to preserving and maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all creditors and parties in interest.

37. The Debtors intend to use cash collateral consistent with a proposed budget (the "<u>Budget</u>") attached to the Cash Collateral Motion. Such Budget covers the expenses necessary to meet the normal operations of the Debtors' businesses and to properly administer the Debtors' bankruptcy estates while in the protections of chapter 11.

38. As maybe set forth in more detail in the Cash Collateral Motion, I believe FCC will not be prejudiced by the Debtors' use of cash collateral and that FCC is adequately protected.

39. FCC is fully secured by its collateral and enjoys a significant equity cushion as summarized below:

| | |
|---|---|
| $1.52 million | accounts receivable collateral |
| $1.76 million | inventory collateral (cost basis only; fair market value likely higher) |
| <u>$0.62 million</u> | cash deposit held by Lender in escrow as security |
| $3.90 million | Collateral value total |
| - <u>$2.0 million</u> | FCC Debt (approximate) |
| $1.9 million | Equity cushion (95% of debt amount) |

40. In addition, utilizing cash collateral will help to maintain the Debtors' business operations, to continually replenish its accounts receivable and inventory stocks, and thereby to preserve and enhance the value of FCC's collateral. In a forced shutdown or liquidation of the Debtors' business, the value of FCC's collateral could decline.

41. The Debtors also seek court approval to use $400,000 of the approximate $620,000 Cash Escrow that is currently being held by FCC. The Debtors were led to believe

10

362464 v5

that such funds were going to be released to the Debtors at the time they entered into the sale-leaseback transaction. Such funds would help stabilize the Debtors' operations by enabling the Debtors to instill confidence in important vendors and suppliers that the Debtors' have adequate funds to continue paying their vendors and meeting their obligations on a go-forward basis. Such assurances are important because some of the Debtors' vendors are sole-source suppliers and are critical to the success of the Debtors' reorganization. Since FCC enjoys a significant equity cushion, and since such funds will be used to preserve the Debtors' business (and hence FCC's collateral) FCC will not be harmed by the use of such cash collateral.

42. Accordingly, the Court should authorize the Debtors' to use cash collateral in accordance with the Budget.

### C. Motion Regarding Lockbox Account

43. As noted above, the Debtors' income and cash collateral is received at the Lockbox controlled by FCC and not by the Debtors. Since the Debtors anticipate FCC will no longer advance funds under the Loan Agreement as a result of the Debtors' bankruptcy filing, the Debtors have urgent need for access to the funds that are received at the Lockbox.

44. As required by the Loan Agreement, the Debtors' customary invoices instruct the Debtors' customers to mail their payments to the Lockbox which is controlled by FCC. The Lockbox is physically located at PNC Bank, and FCC has entered into a customary "lockbox agreement" which requires PNC Bank to remit all funds received at the Lockbox to FCC.

45. Through the *Debtors' Motion Directing FCC, LLC and PNC Bank To Honor Debtors' Control Over A Certain Lockbox Account*, the ("Lockbox Motion"), the Debtors ask the Court to direct FCC and/or PNC Bank to remit all post-petition funds received at the Lockbox to the Debtors on a go forward basis. To accomplish that, the Debtors are willing to sign a

11

362464 v5

customary "lockbox agreement" with PNC Bank and to pay all normal charges associated with the services provided by PNC Bank.   It would be unduly burdensome for the Debtors to attempt to open up a new, separate lockbox.   Doing so would require the Debtors to change their invoice forms and to notify numerous creditors to send their payments to a new lockbox address.   Not only would it disrupt the Debtors' operations and business relations, it would not address monies that hit the Lockbox prior the completion of any such transition.

46. Accordingly, the Debtors request that the Court grant the relief requested in the Locbox Motion.

### D. Utilities Motion

47. As described in the *Debtors' Motion for Order (A) Establishing Procedures for Utilities to Request Adequate Assurance of Payment, and (B) Establishing Procedures for Resolving Disputes Relating to Adequate Assurance Requests* (the "Utilities Motion"), utility services are essential to the Debtors' ability to sustain its operations while this Chapter 11 case is pending.  In the normal conduct of its business, the Debtor has relationships with approximately sixteen (16) utility companies (collectively, the "Utility Companies") for the provision of telephone, electric, gas, water, sewer, waste management, and other services. The Debtors have provided a list of the Utility Companies attached as Exhibit A to the Utilities Motion.

48. Any interruption of utility service to the Debtors' business would be severely disruptive and diminish the Debtors' chance for a successful reorganization. Accordingly, the Debtor requests that the Court enter an order prohibiting the Utility Companies from altering, refusing, or discontinuing services to, and/or discriminating against, the Debtor on the basis of the commencement of this case or on account of any unpaid invoice for services provided by any of the Utility Companies to the Debtor prior to the Petition Date.   In addition, the Debtor

362464 v5

requests that the Court establish procedures (as more fully set forth in Utilities Motion) for (i) determining requests for assurance of payment, and (ii) to the extent necessary, subject to the procedures set forth in the Utilities Motion, modifying the adequate assurance of payment demanded by Utility Companies.

### E. Motion Regarding Sales and Use Taxes

49. In the ordinary course of their businesses, the Debtors collect certain sales and use taxes and other trust fund taxes (collectively, the "Trust Fund Taxes") from their customers or employees, as applicable, and hold them for a period of time before remitting them to the appropriate taxing authorities. In the *Debtors' Motion for an Order Authorizing Them to Pay Prepetition Sales and Use Taxes and Other Trust Fund Taxes,* the Debtors hereby seek authority to pay all of the pre-petition Trust Fund Taxes that have been collected by the Debtors but not yet paid, which the Debtors estimate to total approximately $18,100.

50. Because the Debtors' officers and directors are legally obligated to ensure the Debtors pay the Prepetition Trust Fund Taxes, and because such amounts are held in trust for the benefit of third parties and thus are not property of the Debtors' bankruptcy estate, the Court should grant the relief requested in the Sales Tax Motion.

51. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

362464 v5

Dated: October 3, 2011

*[signature]*

**DOUGLAS M. UNDERWOOD**
President and Chief Executive Officer
of the Debtors

14

362464 v5